THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HECTOR MONTANEZ, Defendant-Appellant.

First District (1st Division)   No. 1—94—0015

Opinion filed June 10, 1996.

Michael J. Pelletier and Linda Eigner, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Michele I. Lavin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

Is it ineffective assistance of counsel for a defense lawyer to pursue a strategy that requires the jury to ignore the law? Our answer is: not under the facts of this case. We affirm the defendant's convictions and sentences for murder and armed robbery.

FACTS

On September 27, 1991, security guard Ted McWherter was fatally shot in the head while working in a factory at 4250 West Shubert in Chicago. An autopsy showed that the bullet was fired at close range. Two years later, in September 1993, Hector Montanez was tried and convicted by a jury. He later was sentenced to concurrent prison terms of 52 years for first-degree murder and 30 years for armed robbery.

The State's evidence established that Stanley Amenowicz was working as a security guard at the factory with two other security guards. He was monitoring video surveillance cameras of a room containing a cash box and a door which opened to the street. He noticed four men outside the building run toward the doorway leading to the street. Amenowicz told Charles Wasilk, another guard in the room, to take a look. As Wasilk approached the door to the street, the door was pushed open and a silver-colored gun was pushed through the door opening and fired. Amenowicz was then forced to kneel on the floor while someone held a gun to his head and asked him if he had a gun. The cash box then was removed.

Carmen Maldonado testified that she was in the parking lot of the factory about 1:45 p.m. on September 27, 1991, waiting to visit with her roommate, when she saw two men enter the building. They walked directly in front of her several minutes later. She heard one of the men ask an employee where to apply for a job and watched

them walk toward a blue Chevrolet. When the men approached the car and began talking, she observed two more men inside. She recalled this specifically because a horn sounded, notifying the men that the vehicle was blocking a UPS truck. The men moved the car and continued standing beside the car as employees came out for their second break.

Maldonado noticed the two men who had originally entered the factory approach codefendant Tony Gonzalez (whom she knew as an employee), exchange a certain look, then give each other a "high five." The men then went to the blue car. After Maldonado visited with her friend, she drove away and noticed the men still standing by the car. The next month, Maldonado identified the defendant and the four other codefendants in a lineup as the men she saw.

Defendant's confession to the police and an assistant State's Attorney corroborated the physical evidence produced at trial. Defendant's six-page court-reported statement said that he and his brother Carlos, along with Edwin Velasquez, Tony Gonzalez, and Harry Pena, met at Gonzalez' house to plan a "hit" which was to occur on September 20, 1991. Three pistols were to be used, a .44 caliber with scope, a .45 caliber, and a .22 caliber. Nothing in the plan called for shooting or harming anyone. The robbery was ultimately postponed one week until September 27, 1991. Defendant's definition of the word "hit" was never pursued by the police or assistant State's Attorney.

On September 27, defendant drove the others in a borrowed van to the plant where Gonzalez worked. Based on a drawing provided by Gonzalez, Carlos entered first, Velasquez entered second, and defendant followed. Carlos carried the .44-caliber gun, Velasquez carried the .22-caliber gun, and defendant had the .45-caliber gun. After defendant heard a gunshot, he thought his brother had been shot but then saw Carlos waving at them to enter. At Carlos' instruction, defendant took the gun from the deceased and frisked Amenowicz, who was not armed. Defendant did not hit, harm, or fire shots at Amenowicz. After Pena took the money, they returned to defendant's house, where they split up the proceeds, with defendant receiving approximately $4,000. Through Pena and Gonzalez the police recovered the .44-caliber and .45-caliber weapons. Nothing defendant told police or the assistant State's Attorney indicated that he shot anyone, he intended to shoot anyone, or he thought that anyone was going to get shot.

Bullet fragments removed from the deceased were consistent with the .44-caliber gun. Three live .45-caliber rounds and one spent jacket from a bullet were recovered from the scene, but no spent shell casings were found.

The jury found Hector guilty of first-degree murder and armed robbery. Defense counsel filed a post-trial motion raising 13 claims of error, including the issue that defendant could not be held accountable for murder because he did not do the killing.

OPINION

Montanez contends he was denied his constitutional right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8.

From beginning to end, even during a hearing on a post-trial motion, defense counsel maintained it was not the defendant's intent or desire to shoot or kill anyone. But, says the defendant, counsel did not contest the armed robbery charge. He contends that, in light of the accountability and felony murder instructions given to the jury, that was no defense at all. That is, the jury was left with no choice but to convict Montanez of murder.

■ There are two ways a convicted defendant can establish ineffectiveness of counsel. They stem from companion cases decided by the United States Supreme Court in 1984.

First, and more usual, is the two-pronged test announced in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), adopted in this State in *People v. Albanese*, 104 Ill. 2d 504, 526-27, 473 N.E.2d 1246 (1984).

*Strickland* requires a defendant to prove (1) that his lawyer made errors so serious that the lawyer was not functioning as the "counsel" guaranteed the defendant by the sixth amendment, the lawyer's deficient performance falling below an objective standard of reasonableness; and (2) he was prejudiced by the lawyer's deficient performance, the errors being so serious they deprived the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

To satisfy the prejudice prong of the *Strickland* test, the defendant must prove there is a "reasonable probability" that the outcome of the trial would have been different had his lawyer not been ineffective. *Strickland*, 466 U.S. at 692, 80 L. Ed. 2d at 696, 104 S. Ct. at 2067.

An insufficient showing on either prong will defeat the constitutional claim. *People v. Whitehead*, 169 Ill. 2d 355, 381, 662 N.E.2d 1304 (1996). An ineffective assistance claim may be disposed of without examining whether counsel was deficient when the defendant fails to prove counsel's alleged errors were so serious as to deprive him of a fair trial. *People v. Munson*, 171 Ill. 2d 158, 184, 662 N.E.2d 215 (1996).

The second but rarer way to establish ineffective assistance of counsel is contained in *United States v. Cronic*, 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039 (1984). *Cronic* holds that where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Cronic*, 466 U.S. at 659, 80 L. Ed. 2d at 668, 104 S. Ct. at 2047.

*Cronic* was relied on by our supreme court in *People v. Hattery*, 109 Ill. 2d 449, 488 N.E.2d 513 (1985). In *Hattery*, the defense lawyer admitted his client was guilty of three murders, presented no evidence at trial, barely cross-examined, and made no final argument. While conceding his client's guilt to the only charges in the case, counsel contended his client did not deserve the death penalty because he was compelled to take part in the murders. Reversing the conviction, the court held no showing of prejudice under the *Strickland* test was required. Prejudice was presumed. Defense counsel's actions did not subject the prosecution's case to the meaningful adversarial testing required by the sixth amendment. In *People v. Johnson*, 128 Ill. 2d 253, 269, 538 N.E.2d 1118 (1989), the court held *Hattery* must be "narrowly construed" (counsel not ineffective in capital case where he conceded defendant's guilt of one murder charge but made vigorous defense to the felony murder charge).

There is a strong presumption that the disputed action or inaction of defense counsel was merely trial strategy. *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065. A review of a lawyer's competency will not extend to the exercise of his judgment, discretion, trial tactics, and trial strategy. *People v. McKinney*, 260 Ill. App. 3d 539, 545, 631 N.E.2d 1281 (1994).

With these principles in mind, we examine counsel's performance in this case.

Before trial began, defense counsel filed separate motions to quash the arrest, suppress the confession, and sever Montanez's trial from those of the other defendants. Through an interpreter, the defendant testified in support of his motion to suppress. The severance motion was granted. All other motions were denied.

During her opening statement defense counsel did not concede her client's guilt. She urged the jury to consider only the evidence that applied to Montanez, without assuming he agreed with what his brother did.

Defense counsel cross-examined every State witness, consistently developing her theme that Montanez never admitted planning or intending to harm, shoot, or kill anyone. She obtained a concession from one police officer that the defendant was not in the security office when the fatal shot was fired.

During the instructions conference, defense counsel actively participated. She objected to some instructions. She asked that certain exhibits not go to the jury room. She offered a "mere presence" instruction, which was refused.

During the prosecution's closing argument, defense counsel objected several times. In her own argument, she never conceded Montanez was guilty of any crime. She asked for a not guilty verdict on all charges. She attacked the authenticity of the signed confession. She paid almost no attention to the armed robbery charge, asking the jury to treat that charge "separately." She spent most of her time on the murder charge, urging a not guilty verdict because her client did not intend to kill anyone and did not fire the single shot heard in the security office. She reminded the jury there was no evidence that the defendant knew his brother Carlos was going to shoot a security guard:

> "Where is the evidence that Carlos told his pals that he was going to do this. So, now, we have got to find a lot of people guilty. No, you don't have to find a lot of people guilty when they didn't do the murder... They like to talk about felony murder. They have it, and they say because there is an armed robbery, somebody is guilty of murder. You don't have to find that. There is no rule that says you must."

Actually, there is a rule that says the jury must. It is contained in the felony murder and accountability instructions. But the defense lawyer was faced with the defendant's six-page court-reported statement, each page signed or initialed by the defendant. The statement set out the details of the planning and commission of the armed robbery. Then the sharing of the proceeds. It was corroborated by the eyewitness testimony and the physical evidence, including the bullets and guns recovered. A disinterested eyewitness placed the defendant at the scene just before the robbery and murder. The evidence was overwhelming. No viable defense was apparent.

Defense counsel walked a fine line, never actually conceding guilt of either charge, concentrating on the murder charges. Hope for an armed robbery acquittal would be unrealistic. Her strategy clearly was directed at persuading the jury to ignore its instructions and acquit the defendant on the murder charges.

Counsel had "no duty to create a defense where none existed." *People v. Stone*, 274 Ill. App. 3d 94, 99, 653 N.E.2d 1311 (1995).

Juries have the power to return verdicts which defy the facts and the law. See *Horning v. District of Columbia*, 254 U.S. 135, 138, 65 L. Ed. 2d 185, 186, 41 S. Ct. 53, 54 (1920). While a defendant does not have the right to argue jury nullification (*People v. Moore*, 171 Ill. 2d

74, 662 N.E.2d 1215 (1996)), nor the right to a jury nullification instruction (*People v. Douglas*, 208 Ill. App. 3d 664, 567 N.E.2d 544 (1991)), nothing stops him from entertaining a desperate hope that a jury will "acquit a defendant on the basis of extraneous factors." *Moore*, 171 Ill. 2d at 110.

In *People v. Ganus*, 148 Ill. 2d 466, 594 N.E.2d 211 (1992), the defendant claimed he was denied effective assistance of counsel when his lawyer elicited testimony about his gang activity in prison to prove a compulsion defense in a murder case. The law does not allow a compulsion defense in a capital murder case. Affirming the conviction, the court said:

> "[D]efendant literally had no defense. Evidence of his guilt was overwhelming. His counsel conceived a compulsion defense which, though not a legal defense, could or might have persuaded a jury not to convict. Jury nullification is always a possibility. It is not inconceivable that a compulsion defense might have evoked empathy, compassion or understanding and sympathy in the minds of the jurors. It is a truism that if a man is drowning, he will grasp at a straw that comes floating by. A weak or insufficient defense does not indicate ineffectiveness of counsel in a case where a defendant has no defense." *Ganus*, 148 Ill. 2d at 473-74.

■ The power of jury nullification exists, but it is not authorized by the law. A defendant has no right to have the jury defy the law or ignore the undisputed evidence. *People v. Rollins*, 108 Ill. App. 3d 480, 487, 438 N.E.2d 1322 (1982).

Prejudice is presumed only where defense counsel has clearly, unequivocally, and without the defendant's consent conceded every significant aspect of the defendant's guilt (*People v. Flores*, 245 Ill. App. 3d 149, 156, 613 N.E.2d 1372 (1993); *People v. Campos*, 227 Ill. App. 3d 434, 447, 592 N.E.2d 85 (1992)), or where the defense lawyer's mistaken and baseless understanding of the relevant law resulted in the defendant receiving no defense at all. *People v. Kozlowski*, 266 Ill. App. 3d 595, 639 N.E.2d 1369 (1994); *People v. Lewis*, 240 Ill. App. 3d 463, 609 N.E.2d 673 (1992).

■ In this case, defense counsel never conceded her client was guilty of any charge. Nor do we believe counsel misunderstood accountability and felony murder principles. Her obvious hope was that the jury would split its verdict, refusing, despite the instructions, to convict the defendant of a murder he did not plan or intend. Juries have done stranger things than that. *Cronic* and *Hattery* do not apply.

A more difficult question is whether counsel's reliance on the jury disregarding its instructions violated the *Strickland* two-prong test.

The defendant relies on *People v. Chandler*, 129 Ill. 2d 233, 543 N.E.2d 1290 (1989), where the facts are close to those in this case. Chandler was charged with murder, residential burglary, and arson. He admitted to police he and his codefendant broke into the victim's home, ransacked it, and took some items. He said he did not kill the victim, although his codefendant did. Defense counsel had no theory of innocence. He did not cross-examine key prosecution witnesses. He did not call the defendant to the stand, even though he promised he would during opening statement. He admitted that the defendant had broken into the victim's home and stole property. The jury was instructed on felony murder and accountability law, but counsel argued: "I don't think if you take a realistic view of this that you can find Mark Chandler guilty of murder." 129 Ill. 2d at 247.

The court held that the defendant satisfied both prongs of the *Strickland* test: "By failing to comprehend the law of accountability and felony murder, counsel's strategy and actions amounted to no real defense at all." *Chandler*, 129 Ill. 2d at 249. The court found "that there is a reasonable probability that but for counsel's deficient performance, the result of the trial would have been different." *Chandler*, 129 Ill. 2d at 250.

We will not stop to determine whether defense counsel's performance in this case was deficient. This is an appropriate case for the suggestion contained in *People v. Whitehead*, 169 Ill. 2d 355, 381, 659 N.E.2d 1312 (1996): "Thus, if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed."

Our review of the record persuades us there is no reasonable probability this case would have turned out differently had defense counsel merely challenged the State's proof. We cannot conceive of the jury finding the defendant's participation in the armed robbery was not proved beyond a reasonable doubt. For that reason, *Chandler* does not apply.

We do not mean to say we approve of the strategy defense counsel used in this case. In light of *Cronic, Strickland*, and *Hattery*, it is a risky business. Better practice requires defense counsel to test the State's proof against the reasonable doubt standard. In that rare case where jury nullification is the only hope, counsel should obtain the defendant's consent to embark on so perilous a strategy, as did the defense lawyer in *Ganus*.

While failure to obtain the client's consent is not, alone, enough to justify reversal of a conviction on the basis of *Hattery* (*People v. Johnson*, 128 Ill. 2d 253, 269, 538 N.E.2d 1118 (1989); *People v. Douglas*, 208 Ill. App. 3d 664, 672 (1991)), it is something the courts look

to when determining whether concessions of guilt or appeals to bypass the law are violations of the sixth amendment. See *People v. Kozlowski*, 266 Ill. App. 3d 595, 601, 639 N.E.2d 1369 (1994); *People v. Nilsson*, 230 Ill. App. 3d 1051, 1055, 595 N.E.2d 1304 (1992).

We conclude that the defendant in this case did not receive ineffective assistance of counsel.

■ The other issue raised by the defendant has to do with his sentence. He contends it is too severe and that the trial judge failed to consider his age (21 at the time of the offense), his lack of violent history, and his potential for rehabilitation.

A sentencing decision is a matter of judicial discretion. Where the sentence is within the statutory limits, and the trial court did not abuse its discretion, we will not reduce the sentence imposed upon a defendant. *People v. Perruquet*, 68 Ill. 2d 149, 153-54, 368 N.E.2d 882 (1977). When the court hears mitigating evidence, it is presumed that the court considered that evidence, absent some contrary indication in the record other than the sentence imposed. See *People v. Partin*, 156 Ill. App. 3d 365, 373, 509 N.E.2d 662 (1987).

Montanez was found guilty of first-degree murder, which carries a statutory sentencing range of 20 to 60 years. 730 ILCS 5/5—8—1(a)(1)(a) (West 1992). He also was found guilty of armed robbery, a Class X felony, which carries a sentencing range of 6 to 30 years. 720 ILCS 5/18—2 (West 1992); 730 ILCS 5/5—8—1(a)(3) (West 1992). Both the 52-year sentence for first-degree murder and the 30-year sentence for armed robbery fall within the respective statutory ranges. Montanez has not pointed to anything in the record to show that the trial court did not adequately consider the evidence presented in mitigation. In light of the facts in this case, we do not find that the trial court abused its discretion.

CONCLUSION·

We affirm the defendant's convictions and sentences.

Affirmed.

CAMPBELL, P.J., and BRADEN, J., concur.